(275 P.3d 56)
No. 105,298

In the Matter of the Equalization Appeal of PRIEB PROPERTIES, L.L.C., for the Tax Years 2006 & 2007 in Shawnee County, Kansas, Pursuant to K.S.A. 79-1409 and K.S.A. 79-1609.

Opinion filed March 16, 2012. ▪▪▪

*Linda Terrill*, of Property Tax Law Group, of Leawood, for appellant Prieb Properties, LLC.

*Aimee Betzen*, assistant county counselor, for appellee Shawnee County.

Before GREENE, C.J., PIERRON and MARQUARDT, JJ.

GREENE, C.J.: The taxpayer, Prieb Properties, LLC, (Prieb or Taxpayer), seeks judicial review of an order of the Court of Tax Appeals (COTA) that established the value of its commercial real property in Topeka, arguing that COTA erred in failing to recognize that it was barred by res judicata or collateral estoppel from departing from its prior decision setting value on the same property, that COTA was not properly constituted for its ruling, and that COTA erred either in its findings of fact or conclusions of law in relying on build-to-suit lease rental rates for probative evidence of market rent. We reject Prieb's argument on the effect of COTA's prior ruling and the challenge to COTA's legal status when its order was issued, but we conclude that build-to-suit lease rental rates are not probative of market conditions and thus reverse and remand with directions.

## FACTUAL AND PROCEDURAL BACKGROUND

Prieb owns a 45,814-square-foot building on about 4 acres of land located on Wanamaker Avenue in Topeka's prime retail corridor, and it currently leases the building to Best Buy Co., Inc. When Shawnee County valued the property at $4,291,900 for tax year 2006 and $3,850,000 for 2007, Prieb appealed these values to COTA, contending the property should be valued at $2,520,000 for each of these tax years. After an evidentiary hearing, COTA established the value of the property at $3,337,000 for 2006 and $3,850,000 for 2007. Judge Kubik dissented, wrote a separate opinion, and embraced the Taxpayer's proposed value for both tax years. After reconsideration was denied by COTA, Prieb seeks our review of COTA's valuation order.

The record on appeal reflects that the property was burdened by a lease agreement dated August 15, 1996, for a term of 15 years, which required that lessor construct and deliver to tenant an expansion of the building—then configured within 27,000 square feet—to its current size of 45,814 square feet. The parties do not dispute that this lease arrangement was a typical first generation "build-to-suit" lease agreement with lease rental rates established accordingly. For 2006 and 2007, the lease provided for a rental rate of $10.50 to $11 per square foot.

Additional facts are provided below where material to the issues framed.

## STANDARDS OF REVIEW

COTA decisions are reviewed under the Kansas Judicial Review Act (KJRA), K.S.A. 2010 Supp. 77-601 *et seq*. See K.S.A. 2010 Supp. 74-2426(c); K.S.A. 2010 Supp. 77-603(a). The KJRA specifically provides for our standards of review, and several are applicable to this appeal. We are authorized to grant relief when the party seeking such relief sustains its burden to prove the invalidity of the agency action in one or more of the following manners that have been alleged in this appeal: (1) COTA has erroneously interpreted or applied the law (K.S.A. 2010 Supp. 77-621[c][4]); (2) COTA has engaged in an unlawful procedure or has failed to follow prescribed procedure (K.S.A. 2010 Supp. 77-621[c][5]); (3) COTA was improperly constituted as a decision-making body when the decision was issued (K.S.A. 2010 Supp. 77-621[c][6]); (4) COTA's decision was based on a determination of fact that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole (K.S.A. 2010 Supp. 77-621[c][7], [d]); (5) COTA's decision is otherwise unreasonable, arbitrary or capricious (K.S.A. 2010 Supp. 7-621[c][8]).

For purposes of our review of fact findings express or implied, our review of the record as a whole means that

"the adequacy of the evidence in the record before [us] to support a particular finding of fact shall be judged in light of all the relevant evidence in the record cited by any party that detracts from such finding as well as all of the relevant

evidence in the record . . . cited by any party that supports such finding, including determinations of veracity by the presiding officer . . . ." K.S.A. 2010 Supp. 77-621(d).

We do not, however, reweigh the evidence or engage in de novo review. K.S.A. 2010 Supp. 77-621(d).

In applying our standards of review in this context, we are required to take due account of the rule of harmless error. K.S.A. 2010 Supp. 77-621(e).

### DID COTA ERR IN REFUSING TO RECOGNIZE AND APPLY ITS PRIOR ORDER ESTABLISHING VALUE OF THIS PROPERTY TO THE 2006 AND 2007 TAX YEARS?

For its first issue on appeal, the Taxpayer argues that res judicata and collateral estoppel require reversal of COTA's 2006 and 2007 decisions, because the issue of what rents are to be used in an income approach to valuation was raised and decided in the Board of Tax Appeals' (the predecessor to COTA) decision for tax year 2004 regarding this property. In fact, BOTA ruled in its valuation decision for this property in the 2004 tax year that build-to-suit lease rental rates were not probative of market rents.

The County argues that because the Taxpayer did not raise the res judicata and collateral estoppel issues before COTA, these issues are not properly before this court. Although Taxpayer's petition for reconsideration included the statement: "The exact same issue with the exact same parties for the exact same location was decided by the Court of Tax Appeals for years 2003 & 2004 with the results being applied to the 2005 tax year," the Taxpayer did not articulate that it was making res judicata and collateral estoppel arguments or support the arguments with any pertinent authority. Because the Taxpayer did not make these arguments below, the issue is not properly before this court. See K.S.A. 2010 Supp. 77-617; *Kingsley v. Kansas Dept. of Revenue*, 288 Kan. 390, 411, 204 P.3d 562 (2009) ("a party may only argue the issues raised at the administrative hearing"); *In re Tax Exemption Application of Strother Field Airport*, 46 Kan. App. 2d 316, 320, 263 P.3d 182 (2011) ("When a party fails to raise a specific ground for relief in the petition for reconsideration, that argument is not properly preserved for judicial review.").

Even if this court were to reach the merits of these issues, Taxpayer's arguments would fail because the tax years in question are different. Our Supreme Court recently decided that when different tax years are involved in matters of taxation, principles of res judicata and collateral estoppel do not apply because taxes are levied annually. *In re Tax Appeal of Fleet*, 293 Kan. 768, 272 P.3d 583 (2012). Here, different tax years were at issue, and res judicata and collateral estoppel do not apply. Moreover, the doctrine of stare decisis is not generally applicable to decisions of administrative tribunals. *In re Appeal of K-Mart Corp.*, 238 Kan. 393, Syl. ¶ 3, 710 P.2d 1304 (1985). " 'As a general matter,' the court explained in *Hatch v. FERC*, 654 F.2d 825, 834 (D.C. Cir. 1981), 'an agency is free to alter its past rulings and practices even in an adjudicatory setting. . . . However, it is equally settled that an agency must provide a reasoned explanation for any failure to adhere to its own precedents.' " *Honeywell Intern. v. Nuclear Regulatory Com'n*, 628 F.3d 568, 579 (D.C. Cir. 2010); see *Western Resources, Inc. v. Kansas Corporation Comm'n*, 30 Kan. App. 2d 348, Syl. ¶ 7, 42 P.3d 162, *rev. denied* 274 Kan. 1119 (2002).

For these reasons, we reject the Taxpayer's first challenge to COTA's decision.

### WAS COTA PROPERLY CONSTITUTED AT THE TIME OF CERTIFYING THE ORDER AT ISSUE?

Taxpayer next argues that COTA was not properly constituted at the time its decision was certified to the parties. COTA heard this case on January 12-13, 2009. The parties' written closing arguments were submitted to the court on May 4, 2009, and COTA issued its order on September 22, 2010. To correct a minor error in the original certificate of mailing, COTA recertified its order on September 29, 2010.

On August 19, 2010, Judge Rebecca Crotty, who at the time of the hearings in this case was COTA's chief judge, was appointed to the Shawnee County District Court. She was sworn in on September 27, 2010.

Taxpayer argues that at time of the final certification of the COTA order, the only two remaining COTA members were Judges

Larkin and Kubik, one voting with the majority and one dissenting. Taxpayer argues that COTA's decision cannot be upheld by a 1 to 1 ruling.

Taxpayer cites no legal authority for finding that COTA was not properly constituted at the time it issued its decision. As pointed out by the County, however, according to K.S.A. 2010 Supp. 74-2433, COTA judges hold office until their successors are appointed and confirmed. Judge Crotty's successor was not confirmed until January 19, 2011.

Moreover, we note that COTA's first service of the order was on September 22, 2010, prior to Crotty's swearing-in as a district court judge. This service was valid and effective inasmuch as it served the final order on all parties and attorneys of record. The subsequent recertification and service did not change the final order in any way and added only the County's new attorney to the service list. To the extent that there was any error in certifying and serving the decision 2 days after Crotty took the district court bench, we can only consider that to be harmless error that did not serve to invalidate the entirety of COTA's final action in this rather complex proceeding. See K.S.A. 2010 Supp. 77-621(e).

We therefore reject Prieb's challenge to COTA's legal configuration when the order was finally certified.

## Was COTA's Valuation Order Adequately Supported by Substantial Evidence and Otherwise in Accord with Kansas Law and Generally Accepted Appraisal Practice?

The Taxpayer next challenges both the factual and the legal basis for COTA's valuation decision, arguing that rental rates from build-to-suit leases are not probative of market value and should be barred from consideration as market value indicators by generally accepted appraisal practice. We generally agree with Taxpayer on both counts for a host of reasons.

At the outset, and despite our recognition that each tax year presents a new case for purposes of res judicata, we note that the back-to-back decisions on this property reflect completely inconsistent views on the prevailing issue. We quote from the tax year

2004 BOTA decision both because it correctly frames the issue and because it represents a clear inconsistency in approach when compared to the COTA decision at issue in this appeal.

"Both parties acknowledge that the realities of the real estate market for build-to-suit big box facilities present unique appraisal challenges. These challenges arise because big box facilities typically are built for the special business requirements of a particular retailer and because construction costs of such facilities often are financed through build-to-suit lease arrangements. When big box properties sell, they typically sell based on the intangible investment value of an existing build-to-suit lease. If vacant, such properties sell at a significant discount because the existing improvements do not fit the specific requirements of a new occupant, resulting in considerable functional obsolescence. . . .

. . . .

"Based on the expert opinion evidence presented, the Board concludes that build-to-suit leases are financing arrangements for new construction and generally do not provide a reliable indication of value for big box facilities that are resold on the secondary market. There is no indication that the county made any adjustment in its appraisal to account for the functional obsolescence that arises when a big box property that was built to suit the particular purposes of one retailer is sold in a hypothetical sale for use by another retailer (or, for that matter, by the same retailer, who would pay no higher rental rates than the next competitor)."

In the COTA decision subject of this appeal, COTA noted that it had ruled differently in its previous decision, but indicated that "its prior position was overly broad." Here, COTA took a hybrid approach to the valuation issue, concluding that for 2006 tax year, the Taxpayer's appraisal approach would be endorsed with a replacement of the rental rate of $7 per foot with $8.50 per foot—which was apparently derived from the County's appraisal for 2007—and appeared to be based upon the lease rate for a single property that was subject to a second-generation build-to-suit lease. For the 2007 tax year, COTA embraced the County's appraisal approach and value, even though that approach utilized as comparables three big box properties with first generation tenants.

Thus, clearly this appeal frames for our consideration whether the rental rates for properties subject to build-to-suit leases are reflective of market value and can be utilized within the income and sales comparison approaches to value without adjustment under generally accepted appraisal practice.

*What interest does Kansas law require to be valued for purposes of ad valorem taxation?*

At the outset, we must determine what interest Kansas law contemplates shall be valued for ad valorem taxation. The Taxpayer asserts that it is the fee simple interest to be valued, whereas the County contends on appeal that when a property is under lease, it is the leased fee interest to be valued. The County's assertion is without support in the record, however, because all appraisers who testified in this matter agreed that Kansas tax law requires valuation of the fee simple interest. Nevertheless, we must decide this threshold question because it may drive the relevancy of first or second generation build-to-suit rental rates in determining the value of the interest.

"Fee simple interest" is defined as "[a]bsolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat." The Appraisal of Real Estate, p. 114 (13th ed. 2008). Stated another way, "[o]wnership of the fee simple interest is equivalent to ownership of the complete bundle of sticks [property rights] that can be privately owned." The Appraisal of Real Estate, p. 112. A "leased fee interest" is defined as "[t]he ownership interest held by the lessor, which includes the right to the contract rent specified in the lease plus the reversionary right when the lease expires." The Appraisal of Real Estate, p. 114.

Kansas tax statutes do not use the term "fee simple"; however, it is clear that the legislative intent underlying the statutory scheme of ad valorem taxation in our State has always been to appraise the property *as if in fee simple*, requiring property appraisal to use market rents instead of contract rents if the rates are not equal. K.S.A. 79-501 requires that each parcel of real property be appraised for taxation purposes to determine its fair market value. In turn, K.S.A. 2010 Supp. 79-503a defines "fair market value" as "the amount in terms of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting *for property* in an *open and competitive market*, assuming that the parties are acting without undue compulsion." (Emphasis added.)

It is clear, therefore, that the fair market value statute values *property* rights, not *contract* rights.

Kansas' "rules of construction" statute also supports the legislature's contemplation of fee simple valuation, as the statute states that " 'Land,' 'real estate' and 'real property' include lands, tenements and hereditaments, and all rights to them and interest in them, equitable as well as legal." K.S.A. 2010 Supp. 77-201, *Eighth*.

Although the opinion is not specific on the issue before us, our court has faced this issue and impliedly endorsed the view that Kansas ad valorem tax law contemplates valuation of the fee simple interest. See *In re Equalization Proceeding of Amoco Production Co.*, 33 Kan. App. 2d 329, 336-40, 102 P.3d 1176 (2004), *rev. denied* 279 Kan. 1006 (2005). There, the taxpayer relied on an appraisal of a gas processing property based on an income approach to value that capitalized the projected revenue from gas processing contracts in place. COTA predecessor BOTA rejected this approach and endorsed a value based on the cost approach. That approach was sponsored by a commercial appraiser employed by the Kansas Department of Revenue, John Cooper, who testified:

" 'Contracts on an existing gas processing plant amount to encumbrances. They could, they could add value or deduct from value. Therefore, you have to appraise a plant free and clear like an office building. Rents are important but you appraise the property free and clear because those leases may be favorable or disfavorable to the owner. A buyer is going to take that into consideration because they are going to have to live with that long-term. *So far as I know ad valorem taxes valuation is based on market value fee simple interest.* Like I said yesterday, anything less than fee simple interest is a partial interest . . . in the property, not 100 percent. That's why I didn't consider the fact that we didn't have those contracts that important.' " (Emphasis added). 33 Kan. App. 2d at 340.

Our court embraced this view in affirming BOTA's order accepting Cooper's approach and valuation for the property in question. See 33 Kan. App. 2d at 336-40. In so doing, we acknowledged that Kansas law contemplates valuation of the fee simple interest in real property.

Finally, we note that COTA itself has faced this issue and decided that Kansas law requires the valuation of the fee simple estate and not the leased fee interest. In an opinion issued by this court

in the case *In re Tax Complaint of Wine*, 46 Kan. App. 2d 134, 260 P.3d 1234 (2011), our court quoted from a COTA order addressing this question. There, the issue was whether it was acceptable to capitalize contract rents payable under existing ground leases rather than to use market rents to value the underlying land. COTA decided that mere capitalization of contract rents was unacceptable, reasoning:

" 'The [lessor's] share is undervalued because it does not include the value of the land's undivided fee simple estate. Instead, the [lessor] is being assessed on the value of the leased fee interest. The undivided fee is comprised of all rights and interests in a given parcel of real estate without condition or encumbrance. The leased fee, which is a lesser estate in property includes only the landowner's right to receive rents during the term of the lease, plus the value of the reversion upon its expiration.' " 46 Kan. App. 2d at 136.

For all of these reasons, we conclude the Kansas Legislature intended ad valorem taxation of the fee simple interest, not the leased fee estate. Why is this important to this appeal? We agree with one noted commentator, who stated that when valuing the fee simple estate:

"The appraiser theoretically should approach the valuation as if the property were vacant and available to be leased at market rent, recognizing the necessary adjustment for lease-up to stabilized occupancy. Although the definitions are not all consistent with this approach, in most assignments that involve a fee simple estimate for a leased property, the appraiser is seeking a value that assumes fully leased (or at a normalized occupancy level) *at market rent*." (Emphasis added.) Lennhoff, *Fee Simple? Hardly*, The Appraisal Journal 400, 402 (Oct. 1997).

### Are Build-to-Suit Rental Rates Reflective of Market Value?

Before consulting various authoritative sources on this question, we take a common-sense approach to the problem: What is the nature of a build-to-suit lease? We suggest that such a lease is essentially a financing agreement between a lessor and lessee, and the rental rates therein are based in large part upon the revenue needed to amortize the investment required for the required construction—plus a measure of profit—over the lease term or extensions thereof. Accordingly, when one takes a snapshot view of rental rates at any time during such a lease, these rates are not reflective of market rent, but rather just reflective of the rate re-

quired in that specific situation to continue an agreed revenue stream to amortize the lessor's investment, subject to a host of financial risks. In other words, contract rents in a build-to-suit lease are not designed to capture market value for each period within the lease term, but rather are designed to amortize an investment made at the outset and may vary dependent on factors that are unrelated to the real estate market thereafter. Reliable source material is in agreement with this overview.

Perhaps the most reliable and authoritative source in this area is the textbook, The Appraisal of Real Estate (13th ed. 2008), published by the Appraisal Institute. This text recognizes the essential difference in build-to-suit rental rates and true market rentals.

"Like all contracts, a real estate lease depends on the actual performance of all parties to the contract. A weak tenant with the best of intentions may still be a high risk. The same is true of a financially capable tenant who is litigious and willing to ignore lease terms, break a lease, and defy lawsuits. If the tenant defaults or does not renew a lease, *the value of the underlying property does not change, but the value of the leased fee may be seriously affected.*

"Because a leasehold or a leased fee is based on contract rights, the appraiser needs special training and experience to differentiate between what is generally representative of the market and other elements of a contract that are not typical of the market. An understanding of the risks associated with the parties and the lease arrangement is also required. *A lease never increases the market value of real property rights to the fee simple estate. Any potential value increment in excess of a fee simple estate is attributable to the particular lease contract, and even though the rights may legally 'run with the land,' they constitute contract rather than real estate rights.*" (Emphasis added.) The Appraisal of Real Estate, p. 447.

The Appraisal Journal also recognizes that build-to-suit rental rates should not be confused with market rentals in applying an income approach to value:

"Direct capitalization seems to be the preferred model to develop an opinion of value for custom commercial properties via the income capitalization approach. To apply this approach properly, support is needed for its three major ingredients: potential gross income, operating expenses, and overall capitalization rate. The same issues arise with its application as with the sales comparison approach when the appraisal problem involves estimating the market value of the fee simple interest of the custom-built property.

"The first step in applying the income capitalization approach is to determine the market rent. In order to properly develop the market rent, sufficient market evidence must be found of the amount that a willing lessee would pay a willing

lessor to occupy the space. A search of sources usually available to appraisers (such as CoStar, NNNEx.com, or similar services) will quickly reveal many leases. When these leases are scrutinized, however, it will be apparent that almost every one is a lease to the original tenant based on a rate that was driven by that tenant's custom-construction specifications. As such these lease rents have little in common with the rent a second-generation tenant would be willing to pay for the space. Evidence of this is both obvious and available.

"For example, when the fast-food franchise Roy Rogers Restaurants closed, many of its stores went to other fast-food franchises or to local restaurants. However, the buyers stripped the restaurants to their shells, removing all evidence of the prior user, and then rebuilt the restaurants to their own prototypical specifications. The buyers clearly did not want—nor were they willing to pay for—the sometimes expensive custom features of the original construction. So, it quickly becomes apparent that what may look like a substantial pool of potential leases that might be used as comparables in an estimate of market rent for the subject is really of no use whatsoever in determining how much a second-generation tenant would be willing to pay in rent for these custom-built properties." Lennhoff, *You Can't Get the Value Right If You Get the Rights Wrong*, The Appraisal Journal 55, 57 (Winter 2009).

The most comprehensive judicial treatment of this problem is found in a discussion by the Wisconsin Supreme Court. There, the court was faced with the same problem as here and ultimately ruled that the fair market value of a fee simple interest must be based on market rents rather than contract rents, absent the existence of an encumbrance bringing the leased fee value below actual market rates. *Walgreen Co. v. City of Madison*, 311 Wis. 2d 158, 752 N.W.2d 687 (2008). In that case, appraisers for the taxpayer explained the problem posed by valuation of properties burdened by build-to-suit leases:

" '[F]reestanding drug stores are typically developed on a build-to-suit basis between a developer, acting as the landlord, and the planned tenant. In these instances, the developer is responsible to construct the premises to the specifications provided by the tenant. Construction costs often include a higher than average entrepreneurial profit to guarantee against cost overruns and time delays. Subsequently, the rental rate is an amortization over the lease term of the expenses incurred to construct the tenant-specific improvement.

" 'These long-term build-to-suit leases typically do not allocate any marketing or leasing expenses. Also, vacancy rates are likely understated because these single-tenant properties require a longer leasing period to find a suitable tenant. . . . By factoring in these associated costs the resulting rate is most often well above the open market rate commanded by other similar retail properties in the same area.'

"The appraisals conclude: 'Similar to a sale-leaseback transaction, a build-to-suit lease is really a financing tool used by companies to keep capital available for other core business purposes. As such, we will estimate a market rent for the subject building rather than rely on the current contract rent.' " *Walgreens*, 311 Wis. 2d at 189-90.

The Wisconsin court considered the appraisers' testimony and approach to be consistent with Wisconsin law and noted that "a real property assessment should not be based on factors such as unusual financing or above market rent that are not normal conditions of sale reflected in the value of a fee simple property interest." 311 Wis. 2d at 190.

We need not belabor our opinion with quotations from other authoritative source material and decisions in accord from other jurisdictions. Suffice to say that, with a very few exceptions, it is generally recognized that build-to-suit lease rental rates are not reflective of market conditions. See, *e.g.*, *Grant County Assessor v. Kerasotes*, 955 N.E.2d 876 (Ind. Tax Ct. 2011); *Federated Retail Holdings, Inc. v. County of Ramsey*, Nos. 62-CV-08-5061, CO-07-4069, 2011 WL 3821296 (Minn. Tax Ct. 2011) (unpublished opinion); Shapiro, *Big-Box Retailers Beware How Assessors Overvalue Your Property*, National Real Estate Investor (Sept. 2000) (http://www.aptcnet.com/ articles/big_box_retailers.htm); Lennhoff, *You Can't Get the Value Right If You Get the Rights Wrong*, The Appraisal Journal, pp. 55-60; Lennhoff, *Fee Simple? Hardly*, The Appraisal Journal, pp. 400-02; *c.f. Rhodes v. Hamilton Cty. Bd.*, 117 Ohio St. 3d 532, 533-35, 885 N.E.2d 236 (2008); see also *Matter of Eckerd Corporation v. Burin*, 83 A.D.3d 1239, 1241-43, 920 N.Y.S.2d 824 (2011) (finding that the weight of evidence supported appraiser's finding that build-to-suit properties were not truly reflective of market value); *Matter of Rite Aid of New York No. 4928 v. Assessor of Town of Colonie*, 58 A.D.3d 963, 964-66, 870 N.Y.S.2d 642 (2009) (finding that the lower court's decision crediting one appraiser who utilized build-to-suit leases went to the weight of the evidence, not its competency, and affirming the lower court's decision).

Consequently, we hold that rental rates contained in or reflected by commercial build-to-suit leases are not reflective of market con-

ditions and may not be utilized for purposes of the income approach or the sales comparison approaches to value for ad valorem tax purposes in Kansas without a disentanglement by adjustments that is beyond the scope of this appeal. See The Appraisal of Real Estate, p. 447.

### Is COTA's Decision Supported by Substantial Evidence Given Our Conclusion that Build-to-Suit Rental Rates Cannot Be Used?

Although our holding above might serve to dispose of this appeal, we analyze the entire record for the purpose of determining whether COTA's decision might warrant affirmation on other grounds. We determine that it does not.

First, we note that for tax year 2007, COTA embraced the appraised value of County expert Keller without modification. Because both the income and the sales comparison to value indicators were based on first generation build-to-suit lease rental rates without adjustment, those value indicators were invalid, departed from prescribed procedure as we have held above, and significantly impeached the valuation opinions of the appraiser and COTA. See K.S.A. 2010 Supp. 77-621(c)(5).

Next, we turn to tax year 2006, where COTA again acknowledged that the parties' sales and income approaches were the best indicators of value for the property. COTA then found that County Appraiser Meyer did not perform a standard sales approach in 2006 and that the County's 2006 income approach had little probative value. COTA then found that Maier's [the Taxpayer's appraiser's] general approach was conceptually sound, but his net rental rate of $7 per square foot was "in error." The apparent basis for this finding was COTA's "concerns regarding the comparability of Maier's sales and rental comparables." Accordingly, COTA substituted an annual rental rate of $8.50 per square foot, apparently influenced by Keller's work in his 2007 appraisal. COTA commented that it found "credible evidence that the higher rental rates of the build-to-suit rental comparables were due to their superior locations" and that "Keller's rental comparables, unlike Maier's, were situated in locations comparable to the subject property."

The County argues that the parties agreed to consolidate the 2006 and 2007 cases and it was appropriate for COTA to consider appraisal information from both years when making its decision. Both parties note and concede that the $8.50 per square foot rental rate was extracted from Keller's 2007 appraisal, where Keller noted that the Goodwill store in Topeka was similar to the subject property in terms of location, accessibility, quality and condition, age, time, and size.

The problem with COTA's reliance on Keller's comparables, however, is that Keller made no adjustments "to differentiate between what is generally representative of the market and other elements of the contract [here the build-to-suit value] that is not typical of the market." The Appraisal of Real Estate, p. 447. Keller testified that he had no knowledge about how the rental rate was determined for any of the rent comparables he used. Keller also acknowledged that sales prices are influenced by the credit-worthiness of the tenant. He said he made adjustments for this; however, the only adjustment was to one lease, and it was not related to the Goodwill lease.

Moreover, only 18,000 feet of the Goodwill space was subject to the lease relied upon, even though it was a 35,000-square-foot building. The Taxpayer challenged the comparability of this lease rate because the lease of only 18,000 square feet would generally drive a higher rental rate for the smaller space. And, again, the lease was a second generation build-to-suit lease and subject to many of the problems already identified above, although perhaps less so due to its being a second rather than a first generation lease.

The County argues that we have been known to endorse COTA's lack of precision in its factfinding and rationale so long as the resulting determination is conceptually sound and supported by substantial evidence. See, *e.g.*, *In re Tax Appeal of Dillon Stores*, 42 Kan. App. 2d 881, 221 P.3d 598 (2009). To find a lack of substantial evidence, we have said the decision must be so wide of the mark as to be outside the realm of fair debate. *In re Tax Appeal of Horizon Tele-Communications, Inc.*, 241 Kan. 193, 203, 734 P.2d 1168 (1987). So, is COTA's selection of the rental rate for 2007 this wide of the mark?

We must conclude that the selection of the $8.50 rental rate is, indeed, too wide of the mark and outside the realm of fair debate for at least two reasons: (1) The only clear basis for this rate is a second generation build-to-suit lease on only 18,000 square feet, which has been substantially impeached by Taxpayer's testimony as to lack of comparability and this court's holding on the problems of using build-to-suit rates without adjustment; (2) the record as a whole clearly supports market rental rates substantially below the $8.50 rate. This record evidence is best summarized by the dissenting opinion filed by Judge Kubik, who stated:

"[T]he parties primary dispute was in their selected rental rates. Maier's income approach determined a market rental rate of $7.00 per square foot whereas the County and its appraiser Keller determined market rental rates of $9.50 and $9.25 per square foot, respectively. I find that the rental rates of comparable big box properties located in the Wanamaker corridor support the reduced 2006 and 2007 appraised values requested by the Taxpayer. At the hearing, evidence was presented that a 40,000 square foot big box property originally constructed in 1994 with Wanamaker road visibility was leased to Bed, Bath and Beyond for $5.00 per square foot. Further, Keller rental comparable 5, the 'old Hobby Lobby property,' is a 40,000 square foot single tenant big box property constructed in 1993 located within two blocks of the subject property with similar location and access as the subject property. This property had an asking rental rate of $6.25 per square foot.

"These rental rates are the best evidence of the market and support the findings and conclusions found in the Maier appraisal. The Keller appraisal relied on build-to-suit rental rates for its rental rate determination. These rates frequently reflect a financing transaction, rather than the market rental rates of the particular property."

We agree with Judge Kubik. We have little confidence in an appraised value determined within the framework of one appraiser with a rather arbitrary substitution of a key factor that proves to be of limited comparability and tainted by a build-to-suit lease. This is especially true given our duty to examine the record as a whole and our conclusion that $8.50 appears out of line when compared to a host of evidence to support a market rental rate of $5 to $7 for comparable properties that are not currently burdened by build-to-suit leases.

Notwithstanding our disapproval of COTA's valuation decision, we are not inclined to direct the entry of a substitute value because COTA had concerns regarding the comparability of at least some

aspects of the Maier appraisal as well. Thus, in summary, we hold as follows relative to the property valuations for both respective tax years:

(1) COTA's valuation order on the subject property for the 2006 tax year is reversed and vacated because a key factor in its approach was not supported by substantial evidence when viewing the record as a whole, and it appears to have been arbitrarily selected, and—to the extent it was influenced by build-to-suit leases—it departed from prescribed procedure, all requiring relief under K.S.A. 2010 Supp. 77-621(c)(5), (7), and (8);

(2) COTA's valuation order on the subject property for the 2007 tax year is reversed and vacated because the conceptual approach endorsed was tainted by heavy reliance on rental rates taken from first generation build-to-suit leases, thus departing from Kansas law and prescribed procedure, requiring relief under K.S.A. 2010 Supp. 77-621(c)(4) and (5).

For these reasons, COTA's valuation order on the subject properties is reversed and vacated, and the matter is remanded to COTA with directions to conduct such proceedings as may be required to achieve fair market value of the property for both tax years in a manner not inconsistent with this opinion.

Reversed and remanded with directions.